# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

FELTON WENDELL MASON                                    PLAINTIFF

V.                          No. 4:20-CV-1387-JTR

KILOLO KIJAKAZI, Commissioner
Social Security Administration[1]                        DEFENDANT

## ORDER

## I. Introduction

Plaintiff, Felton Wendell Mason, applied for disability benefits, alleging disability beginning on June 24, 2015. (Tr. at 11). After conducting a hearing, the Administrative Law Judge ("ALJ") issued a partially favorable decision on February 27, 2020. (Tr. at 29). Although the ALJ concluded that Mason was disabled from June 24, 2015 through October 17, 2018, he determined that Mason's disability ended October 18, 2018 and he had not become disabled again since that date. (Tr. at 28). The Appeals Council denied Mason's request for review (Tr. at 1), making the ALJ's denial of Mason's application for benefits the final decision of the Commissioner.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration and is substituted as the Defendant in this action. Fed. R. Civ. P. 25(d).

Mason filed this case seeking judicial review of the decision denying him benefits. For the reasons stated below, the Court[2] reverses and remands this case for further consideration.

## II. Background and Relevant Medical History

In 2016, Mason applied for supplemental security income. He alleged disability beginning on June 24, 2015 due to impairments from his lower back problems, strokes (including both massive and mini-strokes), diabetes mellitus, peripheral neuropathy, hypertension, post-traumatic stress disorder (PTSD), and anxiety.

Mason submitted medical records dating through the end of 2016. The records show that Mason was hospitalized from June 26 to July 20, 2015 after suffering an acute bilateral CVA (stroke) with occipital and cerebellar involvement and obstructive hydrocephalus, for which he underwent an emergent bilateral decompressive craniectomies, a left cerebellar strokectomy to remove necrotic brain tissue, and external ventricular drain (EVD) placement with complications. After discharge, Mason continued to have dizziness and trouble ambulating with a walker, and his wife reported concerns about his state of mind. She reported that he was "volatile" and agitated, making threats against her. (Tr. at 609). He was hospitalized

---

[2] The parties have consented in writing to the jurisdiction of a United States Magistrate Judge. *Doc. 4.*

again from August 14 to August 28, 2015 for enlarging pseudomeningocele and encephalomalacia, during which time he received a ventriculoperitoneal shunt.

Afterwards, Mason received physical therapy, occupational therapy, speech therapy, and nursing services. (Tr. at 643). By September 16, 2015, his strength and balance were increasing, and he was ambulating independently with a walker. Treatment providers did note mild memory impairments, impulsivity, agitation and anxiety. The record indicates he was receiving home health services.

Through 2016, Mason was treated for various conditions, including chronic lower back and leg pain, peripheral neuropathy with numbness and weakness, hypertension, uncontrolled diabetes mellitus, cognitive issues, anxiety, bouts of dizziness, headaches, loss of balance, and gait disturbances. Clinical notes indicate he was walking with a cane. (Tr. at 953, 988). Mason complained about pain radiating from his hips to both legs, requiring him to have to sit for a few minutes before walking again. A lumbar spine MRI from December 2014 showed moderate bilateral facet joint arthropathy at L4-L5 with bilateral facet joint hypertrophy but no significant osteophytic changes at L2-L3 and L3-L4, mild facet joint hypertrophy on the right at L5-S1, and conjoined root sleeve for the right L5 and S1 roots. (Tr. at 801). A nerve conduction study and EMG were performed on Mason's left leg in February 2016 which showed findings consistent with a significant sensorimotor peripheral neuropathy and no evidence of lumbar motor nerve root irritation. (Tr. at

936). Mason's neurological exams were mostly normal, though he did consistently report having problems with short term memory loss. (Tr. at 887, 905, 931, 954).

To assist state agency reviewers in determining the effects of his mental impairments on his residual functional capacity ("RFC"), two different psychologists examined Mason and submitted medical source statements. The first psychologist, John M. Faucett, Ph.D., examined Mason in January 2016. (Tr. at 911). Mason arrived with his caregiver and walked with the assistance of a cane. He reported problems with short-term memory loss, change in mental status, balance issues, sleep disturbances, and anxiety since suffering his stroke. Dr. Faucett diagnosed him with adjustment disorder with mixed anxiety and depressed mood. He noted that a diagnosis of dementia due to stroke should be ruled out, but that Mason "did not exhibit any dramatic memory or other cognitive deficits" during the evaluation. (Tr. at 914).

Samantha Short, Psy.D., conducted a second mental evaluation in November 2016. (Tr. at 1040). Following her evaluation, Dr. Short wrote that she had "concerns that the past evaluator did not take the time to write up Mr. Mason's physical appearance and cognitive related deficits that were evident during clinical observations." (Tr. at 1043). She found that Mason had significant attention and memory problems, poor speech with some periods of clarity, significantly slowed thought process, and "significant cognitive deficits that are likely caused by the

4

stroke and intensive brain surgery where part of his brain was removed." (Tr. at 1042). She said that Mason was easily confused, lost his train of thought several times, and was tearful on a few occasions. She found that Mason performed well on the mental status evaluation because he was intelligent and self-motivated, but that he could not maintain those skills throughout a 45-minute interview. Dr. Short diagnosed Mason with cognitive impairment (after stroke and brain surgery), adjustment disorder with mixed anxiety and depression, diabetes and neuropathy.

State agency examiners denied his initial claim on February 21, 2017, and Mason requested reconsideration. He submitted additional medical records dating through May 2017. Records from Mason's neurosurgeon show that Mason reported continued headaches, intermittent gait disturbances, vision loss issues, extremity weakness and numbness, and "'seizure activity' with increased difficulty walking and head feeling jiggley." (Tr. at 1058). A head and neck CT in March 2017 showed that Mason had occluded vertebral arteries, which did not warrant surgical or radiological intervention, but were "likely the cause of his cerebellar stroke." (Tr. at 1059, 1125). The CT also showed 50% stenosis of the middle left subclavian artery and 90% stenosis of the proximal left external carotid artery, with volume loss and encephalomalacia left cerebellar hemisphere. (Tr. at 1099, 1125). A mental status exam conducted by his neurologist on May 16, 2017 showed normal clinical findings. (Tr. at 1127). An EEG was ordered based on Mason's reports of a mini-

stroke in April 2017 and seizure activity. Results came back normal. Mason also saw a pain management specialist during this time for pain in his neck, shoulder, back, and hips radiating to his upper and lower extremities. (Tr. at 1116).

In October 2017, state examiners determined that more information was needed to determine the severity of Mason's gait and postural limitations. (Tr. at 132). The agency ordered a physical consultative examination, which was performed in December 2017 by Clifford Evans, M.D. (Tr. at 1146). Dr. Evans found that Mason had difficulty opposing his thumb to fingers and he could not do heel and toe walking or arise from a squatting position, but his gait was "ok," and he could stand and walk without assistive devices. (Tr. at 1149). Dr. Evans diagnosed him with a history of craniectomy, history of stroke and "dead brain tissue removed," insertion of shunt in right temporal area, diabetes mellitus, and anxiety since his CVA "(was ok prior to stroke)." (Tr. at 1150). Dr. Evans wrote that Mason "needs [a] mental status exam" and noted that Mason did not have a "live-in" caretaker but had a caretaker checking in on him daily. *Id*. Ultimately, Dr. Evans opined that Mason had "severe limitations re: body as a whole and mental and physical deficits" with "poor cognitive and self-control issues." *Id*. He also opined that Mason needed a caretaker.

Mason's claim was denied upon reconsideration on January 3, 2018. (Tr. at 170). He requested a hearing before an ALJ and submitted additional medical evidence dating from January 2018 through October 18, 2018. (Tr. at 42–44).

Those medical records establish that Mason presented to the emergency room on January 20, 2018 with complaints of slurred speech and unsteady gait. (Tr. at 1174). He also had mild weakness in all extremities, but he said the weakness was about the same as it had been since his previous stroke. He told doctors that he had a "coughing fit" and afterwards had dysarthria (difficulty speaking). (Tr. at 1185). He also had difficulty writing his name when he arrived at the ER. An MRI showed that Mason had suffered a left basal ganglia and extending subcortical white matter lacunar stroke. (Tr. at 1186). The MRI also showed focal encephalomalacia in the in the left inferior and right mid to superior cerebral hemispheres that appeared chronic, likely the sequela of his previous stroke. (Tr. at 1183). On isolated motor testing, he showed reasonably full strength throughout with maybe equivocal weakness in the right grip and finger extensors as well as mild clumsiness in his right arm. He had decreased light touch in the feet, mild dysmetria (lack of coordination) in the left greater than right lower extremity, absent reflexes at the ankles, and mute plantar responses bilaterally. Other findings were mostly normal. He was directed to follow up with his primary care doctor for referrals to speech therapy and physical therapy.

At a follow-up appointment on March 7, 2018 with his primary doctor, Dustin Creech, M.D., the doctor noted that Mason was "getting his speech and most of [his] strength back." (Tr. at 1165). He had weakness in his left hand but was able to walk more than he had been. A week later, Dr. Creech found that he had some weakness

on his left side, thought to be due to the recent stroke, with cramping in his hands and calf muscles. Dr. Creech referred Mason to cardiology after he found he could not palpate Mason's pulse in his hands, feet, or ankles, or get a blood pressure reading on his left arm or leg. He also referred Mason to general surgery to care for an ulcer on his left great toe.

On April 19, 2018, Mason was referred for a peripheral angiogram indicated by leg claudication and the ulcer on his left toe. The results showed that his right common iliac artery was 80% stenosed and his left common iliac artery was 100% occluded. He also had severe disease of the left subclavian artery with 80–90% stenosis as well as significant below knee disease on the right side. (Tr. at 1191, 1196). He was diagnosed with severe peripheral artery disease (PAD). Mason also complained of chest pain for several days, so he underwent a coronary angiogram which showed mild coronary artery disease with no significant blockages.

In July 2018, he was admitted for what appeared to be worsening cellulitis of his right foot and an ulcer between his toes which was resistant to antibiotics. (Tr. at 1513). He reported severe right foot pain with cold toes that required him to "be up and moving and on his feet all the time to deal with the pain." (Tr. at 2764). Clinical notes show he walked with a cane and he was positive for arthralgias (joint pain), back pain, gait problem, joint swelling, neck pain, dizziness, weakness, numbness,

and headaches. He was negative for speech difficulty, syncope, and light-headedness. He had normal range of motion and a normal neurological exam.

Mason underwent two failed procedures trying to return blood flow to his foot, during which doctors found total occlusion of Mason's distal aorta, right common iliac artery, left common and external iliac arteries, and left common femoral artery. (Tr. at 2304, 2620). There was 70% stenosis in the right common femoral artery. (Tr. at 2303). His toe turned black in August 2018. (Tr. at 2563).

On August 21, 2018, Mason underwent aortobifemoral bypass and left common femoral artery endarterectomy to treat his severe aortoiliac disease. (Tr. at 2059). He was ultimately discharged on September 9, 2018.

Mason's toe regained a pink color after surgery, but it had to be amputated on September 28, 2018 due to osteomyelitis and gangrene. (Tr. at 2740). Mason was discharged home on October 1, 2018. Clinical notes from a neurology appointment on October 5 show that he had a gait problem and required a cane to get around. (Tr. at 2732). He complained of severe right foot pain with cold toes, and he was positive for dizziness, headaches, and visual disturbance. (Tr. at 2734). He exhibited abnormal coordination, but his neurological exam was otherwise normal. (Tr. at 2735).

On October 18, 2018, Mason attended a follow-up appointment regarding his vascular procedures. (Tr. at 2713). He reported improvement in his leg pain

following the surgery, and he could walk two blocks without pain. He was receiving home health visits three days per week for physical therapy and wound care. He reported dizziness with sudden position changes and chronic numbness and tingling sensation in his legs. His ankle-brachial index (ABI) and toe-brachial index (TBI) values were within a clinically acceptable range and he appeared stable from an arterial standpoint at that time. He was encouraged to engage in a daily progressive walking regimen as safety would tolerate.

At an interval visit in January 2019, he reported a "drastic improvement" in his symptoms since the procedure, stating that before the procedure he could barely walk, but now he could walk without a cane with very little pain. (Tr. at 2716–17). His right TBI, however, was outside of the clinically acceptable range. (Tr. at 2723). He reported chronic numbness and tingling in both legs that was responding to medication and not worsening. He also reported to his pain management provider at that time that his leg pain was "better after bypass." (Tr. at 2701). He still complained about numbness and lower back pain shooting down his leg at that appointment and at a follow-up in March 2019. (Tr. at 2703). He also reported falling.

At an appointment with Dr. Creech on April 5, 2019, Mason had no sensation in his toes bilaterally, but normal sensation at midfoot and heel. (Tr. at 2631). On April 22, 2019, his right TBI remained abnormal but was improved from the

previous assessment. (Tr. at 2720). Mason denied claudication and said his legs were "feeling fine." (Tr. at 2719).

## III.   The Commissioner's Decision

The ALJ found that Mason had not engaged in substantial gainful activity since his alleged onset date of June 24, 2015. (Tr. at 15). At Step Two of the five-step analysis,[3] the ALJ found that Mason had the following severe impairments: cerebrovascular accident (CVA) treated with decompressive craniectomy and external ventricular drain (EVD) placement, pseudomeningocele treated with ventriculoperitoneal shunt placement, lumbar degenerative disc disease, peripheral artery disease, chronic pain syndrome, chronic kidney disease (CKD), diabetes mellitus with neuropathy, hypertension, obesity, right 4th-toe amputation, cognitive impairment, and adjustment disorder with mixed anxiety and depression. (Tr. at 15, 19).

After finding that Mason's impairments did not meet or equal a listed impairment, the ALJ determined that from June 24, 2015 through October 17, 2018, Mason had the residual functional capacity ("RFC") to perform work at the

---

[3] Using this five-step sequence, the ALJ determines: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g).

secondary exertional level, except that: (1) he could never climb ladders, ropes, or scaffolds; (2) he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; (3) he could occasionally push, pull, and operate foot controls with his lower extremities; (4) he would need to avoid concentrated exposure to hazards, including work-related driving; (5) he would be limited to unskilled work where interpersonal contact is only incidental to the work performed, the complexity of tasks is learned and performed by rote with few variables and little judgment, and the required supervision is simple, direct, and concrete; and (6) due to impairment-related symptoms, he would miss at least two days of work per month on a regular and consistent basis if employed. (Tr. at 15–16). The ALJ determined that Mason could not perform his past relevant work as a handyman or construction worker. (Tr. at 17). Relying upon Vocational Expert ("VE") testimony, the ALJ found that, based on Mason's age, education, work experience, and RFC, no jobs existed in significant numbers that Mason could have performed. (Tr. at 18). As a result, the ALJ found that Mason was disabled from June 24, 2015 through October 17, 2018. (Tr. at 19).

The ALJ then performed an eight-step analysis to determine whether Mason had shown "medical improvement" in his condition that warranted the termination of his continuing disability benefits.[4] The ALJ determined that Mason had not

---

[4] The sequence of steps used for the continuing disability review process is outlined in *Dixon v. Barnhart*, 324 F.3d 997, 1000–01 (8th Cir. 2003):

developed any new impairments since October 18, 2018, and none of the impairments met or equaled a listed impairment. (Tr. at 19). The ALJ found that Mason experienced a medical improvement in his condition on October 18, 2018 that was related to his ability to work because Mason's RFC had increased. (Tr. at 22). The ALJ found that Mason could now perform work at the light exertional level and would no longer miss at least two days of work per month on a regular and consistent basis. *Id*. The remaining RFC limitations remained the same.

Relying on VE testimony, the ALJ found that since October 18, 2018, Mason was unable to perform his past relevant work, but based on his age, education, work experience, and increased RFC, jobs existed in significant numbers in the national economy that he could perform, including positions as router, price marker, and production assembler. (Tr. at 27–28). Thus, the ALJ concluded that Mason was not

---

The regulations for determining whether a claimant's disability has ceased may involve up to eight steps in which the Commissioner must determine (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

disabled beginning on October 18, 2018, and he had not become disabled again since that date. (Tr. at 28).

## IV. Discussion

Mason argues that the ALJ erred in finding "medical improvement" as of October 18, 2018, and he contends that substantial evidence does not support the ALJ's decision to discontinue benefits beginning on that date. He argues that the ALJ improperly discounted his subjective complaints, afforded improper weight to the medical opinions of record, and erred in failing to order a consultative examination to determine whether medical improvement had occurred. After reviewing the record as a whole, the Court concludes that the Commissioner's decision should be reversed and remanded for further review.

Although a claimant bears the initial burden to demonstrate that he is disabled, once Mason met that burden, the burden shifted to the Commissioner to show that Mason was no longer disabled based on medical improvement. *Koch v. Kijakazi*, 4 F.4th 656, 663 (8th Cir. 2021) (citing, *inter alia*, *Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991) (per curiam) ("If the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work.")).

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

The United States Supreme Court recently held that "whatever the meaning of 'substantial' is in other contexts, the threshold for such evidentiary sufficiency [in Social Security Disability cases] is not high. Substantial evidence…is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial

evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477.

"Once an ALJ has found that a claimant is, or has been, disabled, he may then determine whether that disability has ceased by applying the medical improvement standard." *Koch*, 4 F.4th at 663. "Medical improvement" is defined by the relevant regulations as "any decrease in the medical severity of [the claimant's] impairment(s) which was present" at the time the claimant was found disabled. 20 C.F.R. § 416.994(b)(1)(i). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with" the claimant's impairments. *Id*. The issue under the medical improvement standard is "whether the claimant's medical impairments have improved to the point where he is able to perform substantial gainful activity." *Delph v. Astrue*, 538 F.3d 940, 945 (8th Cir. 2008). Determining medical improvement requires a direct comparison between the claimant's current condition and his condition at the time he was found disabled. *Id*. § 416.994(b)(2).

The ALJ concluded that Mason was no longer disabled because he reported to his doctors that his leg pain had decreased after his vascular surgeries and he could now walk two blocks without a cane and without pain. After carefully reviewing the record, the Court finds that substantial evidence on the record as a whole does not support a finding that the improvements to Mason's leg pain and ability to ambulate

were significant enough that he could perform the requirements of light work and that he would no longer miss two days or more of work per month.

The ALJ's decision to deny benefits after October 18, 2018 was based on his assessment of Mason's RFC for that time period. "An ALJ determines a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007). In determining the RFC, an ALJ "may not simply draw his own inferences about [the claimant's] functional ability from medical reports." *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004).

Mason argues that the ALJ erred by not considering all of his limitations in fashioning his RFC. He contends that the medical evidence alone is insufficient to support the RFC and faults the ALJ for making a medical improvement finding without first asking a treatment provider or consultative examiner to assess his condition as of October 18, 2018. "The ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Brown v. Colvin*, 825 F.3d 936, 939 (8th Cir. 2016) (quotation omitted). "An ALJ

17

does not have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Combs*, 878 F.3d at 647 (cleaned up). "But an ALJ must not substitute his opinions for those of the physician." *Id*. (quotation omitted) (citing, *inter alia*, *Pate-Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 2009) (noting that ALJs may not "play doctor")).

In this case, the ALJ's finding of medical improvement was based solely on Mason's reports of improved leg pain and ability to ambulate after his arterial bypass procedures. These reports led the ALJ to two conclusions. First, the ALJ determined that Mason's statements warranted an increase in Mason's RFC from sedentary work to light work. The ALJ did not explain why Mason was limited to sedentary work in the first place, but the sedentary limitation is amply supported by the evidence, including evidence regarding Mason's peripheral artery disease, lumbar degenerative disc disease, chronic pain syndrome, uncontrolled diabetes mellitus with neuropathy, toe amputation, and neurological problems.

The decision to increase his RFC to the light exertional level, however, is not supported by the medical evidence alone. Mason's reported ability to walk two blocks without using a cane and without feeling leg pain, without more, cannot justify a finding that Mason could stand or walk up to six hours per day and lift up to 20 pounds at a time. *See* 20 C.F.R. § 416.967(b) (describing physical exertion requirements of light work). This is especially true in light of Mason's testimony as

well as other evidence from this time period showing that Mason still had no sensation in his toes bilaterally; continued to report numbness, weakness, balance issues, gait disturbance, and falling; continued to be treated for lower back pain that radiated to his hips and the back of his left leg; and maintained the same pain medication prescription as before. Moreover, on October 18, 2018, Mason was still receiving home health visits three days a week for both physical therapy and wound care, which seems incompatible with the notion that Mason was in a condition to perform light work at that time. The administrative record does not contain any documentation from Mason's home health visits.

The second conclusion the ALJ derived from the medical records was that Mason would no longer require an absentee limitation in his RFC. Again, the ALJ failed to provide any rationale for how Mason's reported improvement in leg pain and ambulation could justify removing this limitation. The ALJ originally found that the combination of Mason's physical and mental limitations—"particularly the residual effects of his stroke and head surgeries"—would cause Mason to miss two days of work per month on a regular and consistent basis. (Tr. at 17). The ALJ made no mention of what those "residual effects" were, and he gave no explanation as to why they apparently stopped causing issues after October 17, 2018. This vagueness plagues the ALJ's opinion and frustrates the Court's ability to review its findings.

Perhaps the ambiguity could be overlooked if the ALJ had discussed any evidence from around the time of medical improvement concerning the severity of Mason's cognitive impairment or other resultant effects from his strokes, such as dizziness, impaired balance, intermittent slurred speech, extremity weakness, headaches, short-term memory loss, vision changes, or otherwise. But that did not happen here. In fact, quite the opposite—the ALJ's opinion fails to even acknowledge that Mason suffered a second stroke in January 2018, which resulted in new and increased impairments that required both speech therapy and physical therapy for an unspecified duration of time. The Court recognizes that an ALJ is not required to discuss every piece of evidence in the record. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). But an ALJ is not permitted to ignore medical evidence, either, especially when it suggests potentially greater functional limitations than the ALJ found. *See Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000). When, as here, an ALJ's failure to discuss important evidence is coupled with other errors and uncertainties in the opinion, it is appropriate to remand the case for further consideration. *Nowling v. Colvin*, 813 F.3d 1110, 1121 (8th Cir. 2016).

The ALJ also erred in relying upon the opinions of state agency medical consultants as evidence for the post-October 18, 2018 RFC assessment. "The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." *Nevland v. Apfel*, 204 F.3d 853, 858

20

(8th Cir. 2000). Such opinions are even less supportive in this case, since they were all authored before Mason's second stroke in January 2018 and pre-date a significant portion of the available medical evidence, including evidence related to Mason's coronary artery disease, peripheral artery disease, multiple vascular procedures, diabetic wounds, and toe amputation, as well as evidence concerning the effects of his second stroke on his mental and physical condition. After reviewing the additional evidence, the ALJ was forced to conclude that these opinions, which found Mason capable of performing light work with additional limitations, were inconsistent with the 2018 evidence demonstrating the severity of Mason's peripheral artery disease, which the ALJ found "would be expected to cause greater limitations." (Tr. at 27).

The Court certainly does not quarrel with this conclusion. What the Court does take issue with, however, is the ALJ's decision to assign "substantial weight" to these opinions for the period since October 18, 2018, without explaining how the opinions could possibly be relevant. The state agency consultants had never even seen the medical records which warranted the finding of disability in the first place, let alone the medical evidence that supposedly supported a finding of medical improvement thereafter. If the state agency findings were unreliable for the time period up to October 17, 2018, they were almost certainly unreliable for the time period afterward as well. By relying on these opinions for the latter period and not

the former, the ALJ failed to articulate a sufficient rationale for the weight assigned to the opinions to a degree that "allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." 20 C.F.R. § 416.927(f)(2).

Notably, none of Mason's treating providers has ever provided a medical opinion concerning his functional abilities in the face of his severe—and obviously complex—impairments. The Court also cannot help but note the striking disparity between the opinions of the reviewing physicians and the record observations of those who actually met and/or examined Mason.

For example, Dr. Short and Dr. Evans both expressed serious concerns about Mason's physical and mental abilities after their evaluations, even in areas outside of their expertise. In addition to her opinions regarding Mason's severe mental impairments, Dr. Short described Mason's physical condition and wrote that "[Mason] would benefit from a medical evaluation. He does not appear to be in good physical health. There is no physical way that he could do contract work in his condition. . . . It is believed that he may not be medically cleared to work due to his poor balance and other problems related to his stroke and past brain surgery." (Tr. at 1041–43). Dr. Evans, who conducted his physical examination over a year later, emphasized Mason's "severe limitations re: body as a whole" from his physical deficits, then also noted that Mason had "poor cognitive and self control issues" and "need[ed a] mental status exam." (Tr. at 1150). Dr. Faucett, who found that Mason

did not display "dramatic memory or other cognitive deficits" during his February 2016 mental evaluation, nevertheless found that Mason's alleged symptoms—which included short term memory loss, personality changes, and anxiety—were "congruent with [his] overt presentation" and gave Mason a "rule out," or possible, diagnosis of dementia due to stroke. (Tr. at 914). The administrative record even contains an observation from a field office employee who wrote that "[Mason] had a difficult time speaking. His speech was slurred and he couldn't communicate very well. He had a difficult time understanding anything about his earnings history. I asked him whether or not he had a net profit or net loss and he didn't understand what I meant . . . . I repeated my question and he still didn't understand me. [Mason] began crying at the end of the interview and said he just wants someone to see him and observe how bad of shape he is in." (Tr. at 105). It is hard to reconcile these statements with the relatively benign limitations the reviewing consultants suggested for Mason's RFC.

The ALJ afforded the examining opinions "some weight" but found they were of "limited use" because they did not describe many specific functional capabilities and limitations. (Tr. at 26). While that may be true, Dr. Short clearly stated that Mason "did NOT display the capacity to cope with the mental/cognitive demands of basic work-like tasks," while Dr. Evans opined that Mason needed a caretaker based on his severe mental and physical deficits. (Tr. at 1040, 1150). Such emphatic

conclusions tend to speak for themselves. Regardless, the mental examinations date back to 2016, and the physical examination was conducted in 2017. Because these opinions pre-date Mason's second stroke as well as significant evidence concerning the severity of Mason's physical afflictions, they provide minimal probative value in determining whether Mason's condition improved in October 2018.

Mason also argues the ALJ improperly discounted his subjective complaints, including pain. To determine a claimant's credibility with regard to his subjective complaints, an ALJ must fully consider all of the relevant evidence, including "the claimant's prior work record and observations of third parties and physicians relating to: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "[A]n ALJ cannot simply reject complaints of pain because they were not supported by objective medical evidence." *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008).

Despite the ALJ's failure to discuss evidence of Mason's neurological impairments after January 20, 2018, and despite the apparent lack of any such evidence dated beyond October 18, 2018, the ALJ rejected Mason's testimony as being inconsistent with the record evidence. The ALJ did not identify any specific

24

inconsistencies or cite any specific evidence to support this finding. Nor did he adequately consider the so-called *Polaski* factors enumerated above. Such an analysis lacks the consideration and detail required to allow for appropriate judicial review. *See Ford*, 518 F.3d at 982 (ALJ must detail reasons for discrediting testimony and explicitly identify inconsistencies found). Even if the ALJ's analysis had been sufficient, substantial evidence does not support the ALJ's finding that Mason's testimony was inconsistent with the record evidence, given that Mason received the same level of pain treatment following his supposed medical improvement and continued to report issues with gait disturbance, balance, dizziness, and falling to his treatment providers. Remand is appropriate to further develop the record with regard to Mason's credibility.

The most consequential medical records in Mason's case were submitted after the ALJ hearing and their significance should have been immediately apparent. Notably absent from the records, however, is any indication of how Mason's condition affects his ability to work. By not seeking clarification from Mason's treatment providers about the functional effects of his numerous physical and neurological impairments, the ALJ put himself in a position of evaluating more than a year's worth of complex medical records without the benefit of any insight whatsoever from a medical professional. After reviewing these records, the ALJ should have requested further information from one of Mason's treating providers,

or at least ordered consultative examinations, to determine the state of Mason's mental and physical condition in 2018 and beyond. Because the record in this case was not properly developed, the RFC determination for the period on and after October 18, 2018 lacks substantial evidence and does not provide a sound basis for the ALJ's finding of medical

## V.  Conclusion

For the reasons stated above, the Court finds that the final decision of the Commissioner denying benefits as of October 18, 2018 is not supported by substantial evidence. The Court hereby reverses and remands this case to the Commissioner for further development of the record.

IT IS SO ORDERED this 25th day of May, 2022.

_____
UNITED STATES MAGISTRATE JUDGE